# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA

V.

**CRIMINAL COMPLAINT**

**ROGER A. PELLMANN, M.D.**
(d.o.b. XX-XX-1954)

**CASE NUMBER:** **10-M-0202**

I, Ellen Roy, the undersigned complainant, being duly sworn state the following is true and correct to the best of my knowledge and belief. During the period from approximately June 2009 through January 11, 2010, in the State and Eastern District of Wisconsin, and elsewhere, **ROGER A. PELLMANN**, the defendant, did knowingly and intentionally distribute, dispense and possess with intent to distribute and dispense a mixture and substance containing a detectable amount of Fentanyl, a Schedule II narcotic controlled substance, outside the scope of professional practice and not for a legitimate medical purpose, in violation of Title 21, United States Code, Section 841(a)(1).

I further state that I am a Special Agent with the Drug Enforcement Administration (DEA), and that this complaint is based on the following facts:

Please see the attached affidavit of DEA Special Agent Ellen Roy.

Continued on the attached sheet and made a part hereof: _X_ Yes ___ No

Signature of Complainant
ELLEN ROY

Sworn to before me and subscribed in my presence,

_January 13, 2010_
Date

at Milwaukee, Wisconsin
City and State

The Honorable Patricia J. Gorence
United States Magistrate Judge
**Name & Title of Judicial Officer**

Signature of Judicial Officer

## AFFIDAVIT

I, Ellen Roy, being duly sworn and under oath state the following:

Introduction

1. I am currently employed as a Special Agent with the Drug Enforcement Administration (DEA) and have been so employed for fourteen (14) years. I am presently assigned to the Milwaukee Field Office for the DEA. Prior to my employment with DEA, I was employed by the Brookfield Police Department as a police officer for 6 ½ years and, prior to that, as a deputy sheriff for the Los Angeles County Sheriff's Office for 3 ½ years.

2. This affidavit is submitted in support of my application for a search warrant to search the medical clinic operated by Dr. Roger A. Pellmann at W178 N9912 Rivercrest Drive, Suite 102, Germantown, Wisconsin, under the names Center for Medical Imaging, Inc. and Vein & Laser Skin Care Clinics, S.C. ("Germantown clinic") for evidence of the unlawful distribution of controlled substances, in violation of Title 21, United States Code, Section 841(a)(1), and for a criminal complaint charging Dr. Pellmann with violating 21 U.S.C. § 841(a)(1) and a warrant for his arrest.

3. Based on the information set forth below, there is probable cause to believe that evidence of the unlawful distribution of controlled substances will be found at the Germantown Clinic and that Dr. Pellmann unlawfully distributed controlled substances, all in violation of Title 21, United States Code, Section 841(a)(1).

1

4.   Much of the information set forth in this affidavit was provided to me by other law enforcement officers and, in particular, DEA Diversion Investigators. I believe this information is reliable.

Background

5.   On November 10, 2009, and on the application of DEA Special Agent Greg Connor, the Honorable William E. Callahan, Jr., United States Magistrate Judge, issued search warrants in Case Nos. 09-M-528 and 09-M-529 authorizing federal agents to search the Germantown Clinic, as well as a residence located in Muskego, Wisconsin, for evidence of the unlawful distribution of controlled substances, in violation of 21 U.S.C. § 841(a)(1). These warrants were executed on November 12, 2009. A copy of the affidavit of DEA Special Agent Connor submitted in support of his earlier application for a search warrant for the Germantown Clinic is attached to this affidavit as Exhibit 1 and incorporated in its entirety in support of my present application for a search warrant for the Germantown Clinic and a complaint and arrest warrant for Dr. Pellmann.[1]

Probable Cause

6.   As reflected in the earlier application for search warrants, an investigation by the DEA uncovered evidence that Dr. Pellmann was unlawfully distributing controlled

---

[1]In the affidavit of Special Agent Connor submitted to Magistrate Judge Callahan, Dr. Pellmann's first name is erroneously reflected as "Robert."

2

substances, primarily liquid Fentanyl, which is a Schedule II controlled substance, to Jacquelynn Evans, who was employed at the Germantown Clinic and lived at the residence in Muskego referenced above that was searched by federal agents on November 12, 2009.

7.      During the execution of the search warrant at the Germantown Clinic, Dr. Pellmann was interviewed by DEA agents. Pellmann stated that Evans is one of two registered nurses employed at his practice and that she is also the vice president of the business and "she is the boss." Pellmann indicated that he had been treating Evans since approximately March 2009 for pain resulting from a fractured tooth.

8.      According to Pellmann, Evans's tooth became infected and he treated her for this condition with liquid Fentanyl to keep her "pain free." Pellmann stated Evans injected between 3 - 5 ampules[2] of Fentanyl three times per day. Pellmann indicated that he started giving Fentanyl to Evans around May 2009 and she was initially taking 1-2 trays (10 -20 ampules) per day but now was taking approximately 50 ampules per day.

9.      Pellmann also acknowledged that he had prescribed Vicodin for Evans for lower back pain she was having. Pellmann said Evans was also taking hydrocodone intermittently with the Fentanyl for her pain.

---

[2]In this affidavit, as well as in DEA Special Agent Connor's affidavit, the containers of Fentanyl are referred to as ampules or dosage units. In either case, this refers to glass vials containing 2 milliliters (2 ml) of liquid Fentanyl.

3

10. Pellmann indicated that Evans had not been billed or paid for any of the Fentanyl he had provided her. Pellmann also acknowledged that he did not have a medical file or chart documenting his treatment of Evans.

11. Pellmann stated the Fentanyl was the wrong medication for Evans because it is a short acting narcotic and she needs a long acting narcotic, and he has discussed this with Evans but Evans did not want to change medications. Pellmann stated Evans has built up a tolerance to the Fentanyl and needed something longer acting so they tried morphine sulfate but that left Evans with what she described as a "drug hangover" the next morning. Pellmann stated he has continued to tell Evans the Fentanyl is the wrong medication but "the patient is being non compliant" and she has built up a tolerance and is addicted.

12. Pellmann stated he takes the drugs from the clinic to either his house in New Berlin or directly to her (Evans) condo in Muskego. Pellmann explained Evans sleeps at his house and he sleeps at her house but the relationship is platonic, they are just friends.

13. Pellmann stated he does not think his dispensing of Fentanyl and morphine sulfate to Evans is in the usual course of practice. Pellmann admitted the amounts he is providing to Evans are high and more than normal because of her building up a tolerance. Pellmann also agreed that the situation going on between himself and Evans is not in the usual course of practice.

4

14. Pellmann told the agents that, on or about October 31, 2009, 70 ampules of Fentanyl had been stolen from the clinic and that an additional 50 ampules was discovered missing on approximately October 19, 2009. Pellmann suspected that the Fentanyl was stolen by Brian Evans, who is Jacquelynn Evans's brother and was also employed at the clinic.

15. An audit of the records of the Germantown Clinic by the DEA disclosed a significant discrepancy in the amount of Fentanyl received by Pellmann and the amount used during his medical practice.

16. According to the clinic's dispensing log, as of February 26, 2009, Pellmann had 94 ampules of Fentanyl in stock. Records from wholesale distributors and pharmacies that supplied Fentanyl to Pellmann, indicate that during the period from February 26, 2009 through November 12, 2009, he received 11,490 ampules of Fentanyl. At the time of the search, Pellmann had 7 ampules on hand. The DEA located a box containing 600 Fentanyl ampules in Pellmann's car. Pellmann indicated he was taking those ampules to his home because of the earlier theft at the clinic.

17. No dispensing logs could be located for September 2009 and October 2009. The remaining logs accounted for the disposition of only 507 ampules of Fentanyl. Thus, the available dispensing logs accounted for less than 10% of the Fentanyl Pellmann received during this period.

5

18.    The DEA also reviewed patient medical records at the clinic in an attempt to account
       for the disposition of the Fentanyl. The clinic provided records for all patients who
       had received Fentanyl during a medical procedure at the clinic during the period from
       June 1, 2009 through November 12, 2009. These records only accounted for the use
       of 427 ampules of Fentanyl during medical procedures at the clinic. During this same
       time period, Pellmann received 10,590 ampules of Fentanyl, which would include the
       600 ampules found in his car. Thus, the clinic's medical records accounted for the
       disposition of less than 10% of the Fentanyl Pellmann received during this period.

19.    No medical chart or record reflecting the administering or dispensing of Fentanyl to
       Evans was located at the clinic.

20.    On November 23, 2009, Jacquelynn Evans was interviewed pursuant to an agreement
       with the U.S. Attorney's Office that her statements could not be used against her in
       a criminal prosecution. Evans stated that in 2007 Pellmann had given her
       prescriptions for Vicodin for back pain. Pellmann also prescribed Oxycodon,
       morphine sulphate and Fentanyl patches for pain management on several occasions.

21.    In approximately the summer of 2009, Pellmann provided Fentanyl to Evans because
       of pain she was having due to a dental problem. Pellmann started administering
       Fentanyl to Evans via IV (intravenous line) on a regular basis. Evans would go
       through about two or three vials per week for pain management. Evans explained that
       Fentanyl's effect peaks after about 20-30 minutes. Fentanyl did not make her sleepy,

6

which was very different from morphine. Pellmann would give Evans morphine every once in awhile to help her sleep.

22. Over time Evans's dental problems progressed and her use of Fentanyl increased. Rather than administering the drugs via IV, Evans began injecting herself with a solution of Fentanyl and saline via syringe. By the time the DEA executed the search warrant at her residence on November 12, 2009, Evans was administering approximately 40 to 50 vials of Fentanyl per day. She would inject herself at all hours of the day at work or at home. Evans was also receiving morphine from Pellmann a couple of times per week to help her sleep. Pellmann would usually bring the drugs to her residence and on a few occasions, another clinic employee brought packages of drugs to her residence. Sometimes, Evans would go to Pellmann's house to use Fentanyl or morphine that he had at his house.

23. For the past couple of months, Evans has had conversations with Pellmann about her growing tolerance to Fentanyl and her concerns related to such. She claimed that they would have a similar conversation every two to three weeks, but nothing ever became of them. Pellmann told her not to worry and that he had weaned other people off of medication before. Evans believes that Pellmann was trying to help her but also stated that Pellmann never gave her any indication that he would stop giving her the drugs. Evans never once paid for medication or treatment provided by Pellmann.

7

24. Evans checked herself into Roger's Memorial Hospital Rehab Treatment Center from Friday, November 11, and checked herself out on Wednesday, November 18. She stated that she was seeing a physician for her addiction to Fentanyl and taking suboxone for opiate addiction treatment.

January 2010 information from confidential source

25. On January 11, 2010, an employee at the Germantown clinic contacted the DEA concerning recent activity at the clinic. This individual has requested that, if at all possible, their identity be protected. Accordingly, in this affidavit I will refer to this person as CI-1.

26. CI-1 has previously provided information to the DEA concerning Pellmann's receipt and dispensing of morphine that was later independently verified. Specifically, on November 19, 2009, CI-1 told the DEA that, on November 16, 2009, Pellmann had received a box of morphine. According to the CI-1, morphine is not used at the clinic for medical procedures. CI-1 later observed Pellmann placing one of the containers of morphine in his pocket.

27. When interviewed by the DEA on November 12, 2009, Pellmann acknowledged self-administering morphine sulfate for a neck injury and that sometimes Evans assisted him in injecting the morphine.

28. Based on this information, the government contacted Pellmann's lawyer concerning Pellmann's possession and personal use of morphine. On November 19, 2009,

8

Pellmann, through his lawyer, turned over to the DEA a box intended to hold 10 smaller boxes, each of which holds 25, 1 ml ampules of morphine sulfate. The larger box turned over by Pellmann's lawyer, however, only contained 9 of the smaller boxes of morphine sulfate ampules.

29. On January 11, 2010, CI-1 told DEA investigators that within the last week, Pellmann noted on the clinic's dispensing log for Fentanyl that he had dispensed 250 ampules of Fentanyl to Jacquelynn Evans.

30. Subsequent to the execution of the search warrant at the Germantown clinic, Pellmann had received 600 ampules of Fentanyl for use in medical procedures at the clinic. According to Pellmann, when necessary, he typically uses 1 - 2 ampules of Fentanyl for a procedure. As noted above, medical records provided to the DEA reflected that, during the period from June 1, 2009 through November 12, 2009, Pellmann only used 427 ampules of Fentanyl.

31. On January 11, 2010, CI-1 noticed that 50 ampules of Fentanyl were missing and not accounted for on the clinic's dispensing log.

32. On that same date, CI-1 discovered three plastic, zip lock plastic bags in the trash at the clinic. Inside the bags were empty Fentanyl ampules, syringes, dirty cotton pads, and other items. CI-1 removed the bags from the trash and provided them to a representative of the DEA. According to CI-1, needles are not disposed of in the trash at the clinic and are, instead, disposed of in a "sharps" bio-hazard container.

9

33. An examination of the contents of the three bags disclosed 38 empty ampules of Fentanyl, 4 empty plastic trays (each capable of holding 10 Fentanyl ampules), syringes, needles, alcohol swabs, gauze, which appears to be dirty with blood, "Y" adapters for an IV line, and packaging for needles.

34. On January 12, 2010, CI-1 indicated that Pellmann had added notes to the Fentanyl dispensing log indicating he had used two ampules of Fentanyl on January 8, 2010.

Conclusion

35. Based on the foregoing, there is probable cause to believe that Dr. Pellmann has committed violations of Title 21 United States Code, Section 841(a)(1) by distributing and dispensing controlled substances without a legitimate medical purpose and not in the usual course of his professional practice and, further, that evidence of these crimes is located at the business premises of Center for Medical Imaging, Inc. and Vein & Laser Skin Care Clinics, S.C., located at W178 N9912 Rivercrest Drive, Suite 102, Germantown, Wisconsin, which is more particularly described s a two-story, red brick and beige stucco building, located within a small business park. The first floor is a parking garage for employees. The second floor is the office space. Dr. Pellmann's clinic shares the building with a second company called J.B.J. Companies, Inc. (Suite 101). The entrance is located in the center of the building. As you enter the front door, Dr. Pellmann's clinic is the suite located to the left, while J.B.J. is on the right.

10

U.S. District Court } ss
Eastern District of Wis. }
I hereby certify that this is a
true and correct copy of the original
now remaining of record in my
office.
WILLIAM E. CALLAHAN, JR.
Magistrate Judge
DATED: 1/13/10
By: _____
Deputy Clerk

## AFFIDAVIT

I, Gregory L Connor, being duly sworn and under oath state the following:

Introduction

1.  I am currently employed as a Special Agent with the Drug Enforcement
    Administration (DEA) and work exclusively on drug-related investigations. I have
    been so employed for more than ten (10) years. Prior to my employment with DEA,
    I was employed by the Polk County Sheriff's Office in Polk County, Florida for more
    than nine (9) years. For more than eight (8) of those years, I was a Detective in the
    Narcotics Division. For the past two years, I have been assigned to DEA Milwaukee
    District Office. Prior to this assignment, I was assigned to the DEA Baltimore
    District Office in Baltimore, Maryland. In the course of my duties at DEA, I
    investigate violations of federal narcotics laws.

2.  This affidavit is submitted in support of my application for search warrants to search
    the following locations, both of which are more particularly described below, as well
    as in Attachment A to the affidavit:

    a.  The medical clinic operated by Dr. Robert A. Pellmann at W178 N9912
        Rivercrest Drive, Suite 102, Germantown, Wisconsin, under the names Center
        for Medical Imaging, Inc. and Vein & Laser Skin Care Clinics, S.C.
        ("Germantown clinic"); and

1

        b.      The residence of Jacquelynn Evans, located at S95W13335 St. Andrews Drive, Muskego, Wisconsin.

3.     Based on the information set forth below, there is probable cause to believe that evidence of the unlawful distribution of controlled substances, in violation of Title 21, United Sates Code, Section 841(a)(1), will be found at those locations. The United States, therefore, seeks authorization to seize evidence of the commission of this crime.

4.     As indicated below, much of the information set forth in this affidavit was provided to me by other law enforcement officers and, in particular, DEA Diversion Investigator Kathy L. Federico, or was obtained from records maintained by state and federal agencies and large, independent businesses, such as the Walgreen Company. I believe all of this information is reliable.

5.     To the extent that information was provided by a citizen witness, I believe it is credible and reliable because it was corroborated by information obtained from other independent sources, including the investigation and observations of other law enforcement officers and records obtained from independent third parties.

Probable cause

6.     On September 4, 2009, DEA Diversion Investigator Federico interviewed a Source of Information (SOI), who has requested that the DEA attempt to protect his/her identity, concerning the activities Dr. Robert Pellmann, M.D. ("Dr. Pellmann").

2

According to the SOI, Dr. Pellmann has been providing Jaquelynn Evans ("Evans") with large quantities of liquid Fentanyl and morphine sulfate, both of which are Schedule II controlled substances, for no legitimate medical purpose and that Evans is addicted to these drugs.

7.    The SOI stated that Dr. Pellmann operates two medical clinics: The first, which is the subject of my application for a search warrant, is located at W178 N9912 Rivercrest Drive, Suite 102, Germantown, Wisconsin. The other is located in New Berlin, Wisconsin.

8.    The SOI further stated that Evans and Dr. Pellmann have been involved in a sexual relationship for approximately 2 years and Evans works at Dr. Pellmann's Germantown clinic. The SOI stated that since approximately June 2009, Evans has been doing most of her work at home because she is too addicted to narcotic drugs to go to the office.

9.    The SOI also described an incident that occurred approximately 2 years ago, when he/she was at Evans's residence. Evans was complaining to the SOI about having a migraine headache. Evans called Dr. Pellmann and asked Dr. Pellmann to bring her something for her headache. The SOI later observed Dr. Pellmann arrive at the residence with an IV bag (a bag containing fluid to be injected directly into a vein), an IV bag holder, several vials and syringes. The SOI stated that, at this point he/she left the residence.

3

10.     The SOI stated several months ago a Midwest Insurance Group representative, who

        underwrites Dr. Pellmann's employee group health insurance program visited Dr.

        Pellmann's office and informed Dr. Pellmann that the employee group health

        insurance may not be renewed because of the high number of prescriptions Dr.

        Pellmann was writing for Schedule II controlled substances for one of the employees

        at the clinic. The SOI stated the clinic employees fill their prescriptions at Walgreens

        pharmacies.

11.     According to the website for Dr. Pellmann's clinics, Dr. Pellmann operates two

        businesses at his Germantown clinic: Center for Medical Imaging, Inc. and Vein &

        Laser Skin Care Clinics, S.C. The website provides the following description of Dr.

        Pellmann's practice:

                Roger A. Pellmann, M.D. established the Center for Medical
                Imaging, Inc. and Vein & Laser Skin Care Clinics, S.C. in July
                of 2003. Blending experience with expertise, Dr. Pellmann, a
                board certified radiologist, offers exceptional diagnostic
                imaging and laser treatment services on an outpatient basis. He
                has completed residencies in diagnostic radiology at St. Luke's
                Medical Center in Milwaukee, WI and internal medicine at the
                Sisters of Charity Hospital in Buffalo, N.Y.

12.     Records from the Wisconsin Department of Regulation and Licensing indicate that

        Dr. Pellmann is a licensed medical doctor, with a specialty in radiology.

13.     Under federal law, unless specifically authorized, it a crime to distribute or dispense

        a controlled substance. 21 U.S.C. § 841(a). To distribute includes writing a

        prescription for a controlled substance.

4

14.   A physician, who is registered with the DEA, may legally distribute, dispense or administer Schedule II through V controlled substances, as long as the distribution is for a legitimate medical purpose by a physician acting in the usual course of his professional practice.

15.   DEA records indicate that Dr. Pellmann is registered with the DEA to handle (prescribe, dispense and administer) controlled substances listed in Schedules II through V of the Controlled Substances Act, 21 U.S.C. § 800 *et seq*.

16.   Federal law requires registrants, such as Dr. Pellmann, to keep complete and accurate records of all controlled substances received, sold, dispensed, administered, or otherwise disposed of for the last two-year period. These records include executed and unexecuted DEA Schedule II Order Forms, biennial inventories, controlled substance receiving invoices/credits, dispensing/administering records, destruction records, theft reports and any other records documenting the disposition of controlled substances.

17.   Federal law also requires registrants to identify the location at which they will store, distribute, administer, and dispense controlled substances, as well as the location where they maintain records of their receipt and administering of such controlled substances. This is known as the "controlled premises." In 2003, Dr. Pellmann notified the DEA that his Germantown clinic was his "controlled premises."

5

Walgreens prescription records

18. DEA Diversion Investigator Federico contacted representatives of the Walgreen Company, which operates pharmacies under the name Walgreens, and obtained records of all prescriptions written by Dr. Pellmann that were filled at Walgreens pharmacies located in southeastern Wisconsin during the two-year period from September 1, 2007 through August 31, 2009.

19. An analysis of the records obtained from the Walgreen Company revealed that, during this two-year period, Walgreens filled 409 prescriptions that had been written by Dr. Pellmann for narcotic controlled substances. These prescriptions had been written for 206 different patients. Of these prescriptions, at least 138 (approximately 35%) had been written for Evans.

20. The prescriptions Dr. Pellmann wrote for Evans, which were filled at Walgreens, consisted of approximately 109 prescriptions for hydrocodone, and 7 prescriptions for Hydromet, a Hydrocodone based cough syrup, both of which are Schedule III narcotic controlled substances; 6 prescriptions for morphine sulfate, 10 prescriptions for oxycodone, and 2 prescriptions for Fentanyl (or its generic equivalent) patches, all of which are Schedule II narcotic controlled substances. The records obtained from the Walgreen Company reflect that, other than the prescriptions for Schedule II controlled substances issued to Evans, Walgreens pharmacies filled only one other prescription written by Dr. Pellmann for a Schedule II controlled substance.

6

21. These records also indicate that Dr. Pellmann steadily increased the level and type of controlled substances he prescribed for Evans, from 90-170 dosage units per month of hydrocodone or oxycodone in 2007, to as much as 380 units per month by January 2009. In addition, during 2008 and 2009, Dr. Pellmann added the narcotic drugs morphine sulfate and Fentanyl patches to some of Evans's prescriptions. According to DEA Diversion Investigator Federico, this is an unusually large increase in controlled substance prescriptions even for a patient with severe pain.

22. In July 2009, the number of prescriptions written by Dr. Pellmann for Evans and filled at Walgreens decreased dramatically. This generally coincided with the incident describe by the SOI, in which a representative for the health insurance carrier for Dr. Pellmann raised concerns over the large number of prescriptions for controlled substances being written for an employee of his clinic.

Manufacturer and distributor records

23. On October 29, 2009, DEA Diversion Investigator Federico reviewed an internal DEA database called "ARCOS." ARCOS is an automated, comprehensive drug reporting system that monitors the flow of DEA controlled substances from their point of manufacture to their point of sale or distribution. My review of this database revealed that for the years 2006 and 2007, Dr. Pellmann received a total of 230 and 260 dosage units of Fentanyl (.05 mg/ml), a Schedule II controlled substance, at his Germantown clinic.

7

24. ARCOS does not reflect Pellmann receiving any controlled substances during 2008.

25. In June 2009, however, Dr. Pellmann ordered and received 1000 dosage units of Fentanyl, and 250 units of morphine sulfate. This increased to 1280 units of Fentanyl and 200 units of morphine sulfate in July 2009; to 1660 units of Fentanyl and 280 units of morphine sulfate in August 2009; and to 3100 units of Fentanyl and 280 units of morphine sulfate in September 2009.

26. This substantial increase in Dr. Pellmann's ordering of controlled substances generally coincided with the substantial reduction in the number of prescriptions for controlled substances, which were written by Dr. Pellmann, and filled by Evans at Walgreens pharmacies.

Garbage Search

27. On November 3, 2009, with the assistance of the Waukesha Metro Drug Enforcement Unit, DEA Diversion Investigator Federico conducted a search of the garbage from Evans's residence, which is located at S95W13335 St. Andrews Drive, Muskego, Wisconsin. Found in the garbage were 421 empty 2ml size ampules labeled as "Fentanyl Citrate 100 mcg/1ml"; 13 empty 1ml size ampules labeled as "Morphine Sulfate 8mg/1ml"; one empty 20ml size bottle labeled as "Morphine Sulfate 15mg/ml"; numerous syringes and used alcohol pads. Also found in the garbage were documents addressed to Evans.

8

<u>Locations to be searched</u>

28. Based on the foregoing, there is probable cause to believe that Dr. Pellmann has committed violations of Title 21 United States Code, Section 841(a)(1) by distributing and dispensing controlled substances without a legitimate medical purpose and not in the usual course of his professional practice and, further, that evidence of these crimes is located at the following locations:

    a. The business premises of Center for Medical Imaging, Inc. and Vein & Laser Skin Care Clinics, S.C., located at W178 N9912 Rivercrest Drive, Suite 102, Germantown, Wisconsin, which is more particularly described s a two-story, red brick and beige stucco building, located within a small business park. The first floor is a parking garage for employees. The second floor is the office space. Dr. Pellmann's clinic shares the building with a second company called J.B.J. Companies, Inc. (Suite 101). The entrance is located in the center of the building. As you enter the front door, Dr. Pellmann's clinic is the suite located to the left, while J.B.J. is on the right.

    b. The residence located at S95W13335 St. Andrews Drive, Muskego, Wisconsin, which is more particularly described as, a two-story, side-by-side duplex, with a tan brick and beige siding exterior. The front door faces west and is dark brown in color. When facing the building, the residence is located on the left (north) side of the duplex. There is an attached two-garage on the

9

far left (north) side of the residence and the address numerals "S95 W13335"

are displayed on the southwest corner of the garage.